IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TARA WOLFE                          :          CIVIL ACTION
                                    :
         v.                         :
                                    :
ANDREW SAUL,                        :
Commissioner of Social Security     :          NO.  19-5005

## MEMORANDUM OF DECISION

THOMAS J. RUETER
United States Magistrate Judge                 June 18, 2020

Plaintiff, Tara Wolfe, filed this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("Act") and supplemental security income ("SSI") under Title XVI of the Act.

Plaintiff filed a Brief and Statement of Issues in Support of Request for Review ("Pl.'s Br."), defendant filed a Response to Plaintiff's Request for Review ("Def.'s Br."), and plaintiff filed a reply thereto ("Pl.'s Reply").  For the reasons set forth below, plaintiff's Request for Review will be **GRANTED**.

## I.      FACTUAL AND PROCEDURAL HISTORY

Plaintiff filed an application for DIB on September 2, 2016 and an application for SSI on November 7, 2016.  (R. 181-94.)  In each application, she alleged disability beginning March 4, 2016.  Id.  Plaintiff's claims were denied initially; she then filed a request for a hearing. (R. 74-108.)  A hearing was held on September 25, 2018, before Administrative Law Judge ("ALJ") Vivian McAneney.  (R. 31-73.)  Plaintiff, represented by counsel, appeared and testified.  A vocational expert ("VE") also testified.

In a decision dated November 21, 2018, the ALJ found that plaintiff was not disabled under the Act.  (R. 15-30.)  The ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through September 30, 2021.

2.   The claimant has not engaged in substantial gainful activity since March 4, 2016, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.   The claimant has the following severe impairments: fibromyalgia, degenerative disc disease (DDD) of the lumbar and cervical spine, degenerative joint disease (DJD) of the left hip, and dyshidrotic eczema, (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) which involves frequent fingering/feeling; occasional pushing/pulling with the lower extremities; occasional postural activities except no climbing of ladders, ropes, or scaffolds; no exposure to temperature extremes, wetness, humidity, or hazards; the option to alternate between sitting and standing every 20-30 minutes; and simple, routine and repetitive tasks.  The work should accommodate the use of a cane for balance and ambulation.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on August 14, 1970 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from March 4, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 17-26.)

Plaintiff filed a request for review of the ALJ's decision that was denied and the ALJ's decision became the final decision of the Commissioner.  (R. 1-11, 180.)  Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## II.     STANDARD OF REVIEW

The role of this court on judicial review is to determine whether there is substantial evidence in the record to support the Commissioner's decision.  Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 292 (3d Cir. 2012) (citing 42 U.S.C. § 405(g)), cert. denied, 571 U.S. 1204 (2014); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence is more than a mere scintilla of evidence, but may be less than a preponderance of the evidence.  Jesurum v. Sec'y of U.S. Dep't of Health and Human Serv., 48 F.3d 114, 117 (3d Cir. 1995).  This court may not weigh evidence or substitute its conclusions for those of the fact-finder.  Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002) (citing Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992)).  As the Third Circuit has stated, "so long as an agency's fact-finding is supported by substantial

evidence, reviewing courts lack power to reverse . . . those findings." <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1191 (3d Cir. 1986).

To be eligible for benefits, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Specifically, the impairments must be such that the claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). Under the Act, the claimant has the burden of proving the existence of a disability and must furnish medical evidence indicating the severity of the impairment. 42 U.S.C. §§ 423(d)(5), 1382c(a)(3)(H)(i).

The Social Security Administration employs a five-part procedure to determine whether an individual has met this burden. 20 C.F.R. §§ 404.1520, 416.920.[1] This process requires the Commissioner to consider, in sequence, whether a claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment which meets or equals the requirements of a listed impairment; (4) can perform past relevant work; and (5) if not, whether the claimant is able to perform other work, in view of his age, education, and work experience. <u>See</u> <u>id.</u> The claimant bears the burden of establishing steps one through four of the five-step evaluation process, while the burden shifts to the Commissioner at step five to show that the claimant is capable of performing other jobs existing in large numbers in the national economy. <u>Hess v. Comm'r of Soc. Sec.</u>, 931 F.3d 198, 201 (3d Cir. 2019).

---

[1]    For purposes of this opinion, the court will refer to the version of the relevant regulation in effect at the time of the ALJ's decision on November 21, 2018.

III.    BACKGROUND

At the time of the September 25, 2018 administrative hearing, plaintiff was forty-eight years old with a high school education.  (R. 36.)  From 2008 to 2016, plaintiff worked as a school bus driver.  (R. 36-37.)  Prior to that time, plaintiff worked as an office administrator and as a public records researcher.  (R. 37-38.)

Plaintiff testified that she stopped working as a school bus driver because she could no longer drive or climb the stairs to the bus due to pain in her hip and sacroiliac joint.  (R. 39-40.)  Plaintiff described the pain as follows: "Extreme pain in the tailbone, extreme pain in the groin, weakness of my legs.  I couldn't physically do it any more, like I couldn't – I can't like I still can't, I can't squat and get up."  (R. 40.)  Plaintiff further explained that she took a leave of absence and had surgery on her left hip.  Id.  She subsequently had surgery to her left sacroiliac joint, which was followed by revision surgery a few weeks later due to complications from the initial sacroiliac joint surgery.  Id.

Plaintiff stated that she was unable to return to work after the surgeries because she began to experience pain throughout her body.  (R. 41.)  Plaintiff was referred to a rheumatologist and was diagnosed with fibromyalgia.  Id.  In addition, blood tests revealed a positive ANA for lupus which was to be monitored.  Id.  Plaintiff experiences pain throughout her body, but also noted that the pain in her lower back is "really bad" and her left hip is "bad."  Id.  Plaintiff stated that she continues to have pain post-surgery but is reluctant to have a left hip replacement due to the difficult recovery.  Id.[2]  She also noted that she began to experience pain in her right sacroiliac joint.  (R. 41-42.)  Plaintiff elaborated as follows:

_____

[2]    Plaintiff confirmed that she continues to experience pain in her left sacroiliac joint, even after two surgeries.  (R. 44.)  When asked whether her condition had improved since she ceased working, plaintiff indicated that she was "falling apart."  Id.  Plaintiff has been advised that if she

5

> My hips, my – it's your whole entire pelvic area.  So . . . when I sit, I have to transfer my weight from – and I'm doing a lot of damage to my back doing this, but I transfer my weight that I lean forward all the time.  So now, I have problems with my neck, my cervical spine, and now my thoracic spine.  I can't turn my head all the way.  I get burning down into my shoulders and I get this horrible [charley] horse across my ribs into my chest.

(R. 42.)  An MRI was performed to determine the cause of the charley horse pain, but plaintiff had not yet obtained the results of the test.  Id.

With respect to neck pain, plaintiff described a "burning tingling" pain that radiates up into her head and down into her shoulders.  (R. 43.)  Plaintiff was treated by a chiropractor, but did not obtain relief with such treatment.  Id.[3]  Plaintiff experiences neck pain on a daily basis; it prevents her from sleeping for longer than two hours at a time.  Id.  The pain also affects plaintiff's eyes, causing light sensitivity.  Id.  She was told by her chiropractor that the optic nerve is affected.  Id.  Plaintiff also experiences headaches on a daily basis; she was prescribed muscle relaxers to address this problem but indicated that the muscle relaxers cause body pain.  (R. 44.)

At the time of the administrative hearing, plaintiff was taking muscle relaxers and Tramadol to address her pain.  Id.  Plaintiff indicated that her rheumatologist had prescribed Lyrica, Cymbalta, Gabapentin, and Voltaren in the past to address the fibromyalgia pain, but these medications exacerbated plaintiff's eczema.  (R. 45.)  When the eczema flares, plaintiff experiences swelling, blisters, itching, and pain in her hands.  (R. 46-47.)  Plaintiff also stated

---

continued to have problems with her hip, she would need replacement surgery, but plaintiff was reluctant to have such surgery given the problems she previously had with recovery.  (R. 60.)  Aquatic therapy was recommended to plaintiff, but plaintiff felt that it would aggravate the eczema.  (R. 61.)

[3]     She noted that she although she was treated by the chiropractor, she "was only allowed eight visits."  (R. 44.)

that her fingertips become hardened; the skin on her fingers and palms cracks.  (R. 47.)[4]  Plaintiff

receives treatment from a dermatologist who has prescribed a medicated cream to treat eczema.

(R. 48.)  Although the cream treats the eczema to an extent, it also dries out the skin on her

hands.  (R. 48-49.)  Plaintiff has been treated with several different topical medications, after

suffering an adverse reaction to Clobetasol which caused a rash.  (R. 49.)  Plaintiff explained that

her hands are damaged from the eczema; she has difficulty grasping items and tends to drop

them.  Id.  Plaintiff estimated that the eczema flares and causes cracked skin "[p]robably eight

months out of [a] year."  (R. 50.)  Plaintiff acknowledged that the condition does improve at

times, but that it returns.  Id.  She stated that she has had the condition since she was fourteen

years old and has an accumulation of damage to her hands.  Id.  She indicated that she would be

unable to return to office work because she would be unable to type.  Id.[5]

Plaintiff also testified that she would be unable to return to office work due to

neck pain.  (R. 51.)  Plaintiff explained that when she is home, she sits in a recliner because it

offers support for her upper back and neck.  Id.  Plaintiff informed the ALJ that her boyfriend

lives with her and assists her with household chores.  Id.  Plaintiff is unable to perform yard work

or do laundry, as her laundry facilities are in the basement and cannot ascend or descend the

stairs.  Id.  Plaintiff stated that she "fall[s] down the steps all the time" because she gets "pins

and needles" and her hips "lock up."  Id.  Plaintiff's boyfriend does most of the grocery

shopping; she cooks simple meals, such as crockpot meals.  (R. 51-52.)  With respect to self-

care, plaintiff indicated that she utilizes a seat in her shower and her boyfriend installed a bar in

---

[4]     Plaintiff described the cracks as deeper than a papercut, resulting in open sores that bleed
and ooze and which have difficulty healing.  (R. 47-48.)  Sweat also exacerbates the skin
condition; she is unable to wear rubber gloves.  (R. 48.)

[5]     Plaintiff stated that she frequently was absent from work when she worked in an office
because she was unable to work on a computer due to the condition of her hands.  (R. 50.)

the bathtub area to assist plaintiff.  (R. 52.)  Plaintiff is able to dress herself, but acknowledged

that she is no longer able to tie her shoes and must wear slip-on shoes.  Id.

When asked whether she utilizes any other methods of treatment and pain relief,

plaintiff explained that she continues to perform stretches that she learned in physical therapy,

she practices yoga when not limited by neck pain, and she utilizes a TENS unit.  Id.[6]  The TENs

until provides plaintiff with approximately twenty minutes of relief from the pain.  (R. 53.)

Plaintiff also uses a heating pad, which helps with neck pain but does not help with low back

pain.  Id.  Plaintiff stated that she is most comfortable sitting in a recliner or a gravity chair, and

is unable to sit in a straight-back chair.  Id.  When standing, plaintiff needs to lean on something

such a cane or a counter or table.  (R. 53-54.)  Plaintiff estimated that she could stand for no

longer than ten minutes unassisted.  (R. 54.)  If she goes to the grocery store, plaintiff either uses

a shopping cart or "buggy" for assistance.  Id.  Plaintiff does not use the cane inside her house,

but instead holds onto furniture.  (R. 54-55.)  When outside of her house, plaintiff also utilizes a

crutch.  (R. 55.)  When cleaning her house, plaintiff utilizes a transport chair.  Id.  Plaintiff must

"have assistance" to get around because she does not "trust herself."  (R. 56.)

When asked how long she is able to sit in one position, plaintiff indicated that she

was "very uncomfortable" at that point of the administrative hearing.  (R. 54.)  Plaintiff also

testified that she is able to sit for no more than two hours, but that when she sits for that length of

time it is because she is sleeping.  (R. 56.)  Plaintiff clarified that she sleeps in her recliner

because she is unable to sleep in a bed.  Id.  After two hours, plaintiff must get up to find a more

comfortable position.  Id.  Plaintiff also indicated that she would not be able to perform standing

work because she has difficulty lifting her arms.  (R. 57.)  Plaintiff estimated that she could lift a

---

[6]      Plaintiff indicated that the TENS unit was not prescribed, but that she purchased a unit
when she attended physical therapy.  (R. 52.)

gallon of milk, only if she holds onto something to steady herself.  (R. 62.)  She noted that she is

unable to lift her grandchild.  (R. 61.)  Plaintiff also experiences body stiffness when she awakes.

(R. 58-59.)  Plaintiff estimated that she has difficulty walking because she is unstable on her feet

and has weakness.  (R. 59.)  She confirmed that she could walk a block if she used her crutch or

a cane, but would have to stop to rest during the walk.  Id.

              In response to questioning by the ALJ, the VE testified that plaintiff's past work

as a "school bus driver" is classified as medium, semiskilled work, and the "general office clerk

or data entry clerk" and the "administrative clerk" positions are classified as sedentary,

semiskilled work.  (R. 63.)  The ALJ then asked the VE to consider an individual with the same

vocational profile as plaintiff who is limited to sedentary work, with the following additional

limitations: no more than occasional pushing and pulling with the lower extremities; occasional

postural activities, except no climbing of ladders, ropes, or scaffolds; the work environment

should involve no exposure to temperature extremes, wetness, humidity, or hazards; with the

option to alternate between sitting and standing every twenty to thirty minutes; and simple,

routine, and repetitive work.  (R. 64.)  The ALJ also provided that the work must accommodate

the use of a cane for balance and ambulation.  Id.  The VE opined that such individual could not

perform any of plaintiff's past work, but could perform the following sedentary, unskilled jobs:

"table worker" (for which there are approximately 78,000 jobs in the national economy);

"assembler" (for which there are approximately 150,000 jobs in the national economy); and

"callout operator" (for which there are approximately 40,000 jobs in the national economy).  Id.

When asked by the ALJ whether a limitation to "frequent fingering and feeling" would impact

the VE's response, the VE stated, "I believe no impact or very little impact."  Id.  However, the

VE opined that if the individual were limited to occasional use of the hands for fingering and

feeling, such limitation "would decrease significantly the number of jobs available" such that there would be no jobs available to the individual.  <u>See</u> R. 64-66.  The VE confirmed that her testimony was consistent with the Dictionary of Occupational Titles.  (R. 65.)

Plaintiff's counsel was given the opportunity to question the VE and posed several questions regarding fingering and feeling requirements of the jobs identified by the VE. <u>See</u> R. 67-69.  In addition, plaintiff's counsel queried the VE whether the hypothetical individual would be able to maintain employment if the individual was unable to keep pace, given the need to alternate sitting and standing and using a cane or crutch for balance while standing.  (R. 69.) The VE opined that if the individual was able to complete the required work within her shift, the individual would be able to maintain employment, but that no employer acknowledges acceptance of off-task behavior.  <u>Id.</u>  When asked to state the "tolerance for absenteeism," the VE responded, "[g]enerally, on average one-half to a max of two days per month, so about a day a month."  (R. 70.)  The VE also confirmed that an employer would not tolerate an employee's hands that were "oozing or bleeding on the product they are touching."  (R. 71.)  After noting that the record would be kept open for an additional fourteen days for the submission of additional medical records, the ALJ adjourned the hearing.  <u>See</u> R. 71-73.

## IV.    DISCUSSION

The ALJ found that the evidence of record supports a finding that plaintiff has severe impairments, but the impairments do not meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 17-18.)  Ultimately, the ALJ concluded that plaintiff retains the residual functional capacity ("RFC") to perform a range of sedentary work as detailed in her decision.  <u>See</u> R. 18.  Plaintiff presently contends that substantial evidence does not support the ALJ's decision.  Specifically, plaintiff argues that the ALJ erred in

formulating the RFC assessment, in failing to find that plaintiff's eczema meets Listing 8.05, in her consideration of the opinion evidence, and in concluding that plaintiff was capable of performing other jobs.  (Pl.'s Br. at 10-29; Pl.'s Reply at 1-12.)  Defendant maintains that substantial evidence supports the decision of the ALJ.  (Def.'s Br. at 5-18.)

A.    RFC Assessment

Plaintiff contends that the ALJ committed a series of legal errors in evaluating the evidence and formulating plaintiff's RFC.  (Pl.'s Br. at 10-21; Pl.'s Reply at 1-12.)  RFC refers to the most a claimant can do despite her limitations.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC assessment must be based upon all relevant evidence, including medical records, medical source opinions, and a claimant's description of her own symptoms. Pursuant to the regulations in effect at the time of the ALJ's decision, an ALJ must give medical opinions the weight she deems appropriate based on factors such as whether the physician examined or treated the claimant, whether the opinion is supported by medical signs and laboratory findings, and whether the opinion is consistent with the record as a whole.  See 20 C.F.R. §§ 404.1527, 416.927.[7]  The final responsibility for determining a claimant's RFC is reserved exclusively for the Commissioner, who will not give any special significance to the source of another opinion on this issue.  20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).

When formulating plaintiff's RFC, the ALJ addressed the evidence of record pertaining to plaintiff's claims that she is unable to work due to various health issues.  The ALJ described, inter alia, plaintiff's testimony; treatment records pertaining to plaintiff's physical impairments; the January 5, 2017 opinion of the consultative examiner, Ziba Monfared, M.D.; and the January 31, 2017 opinion of the State agency reviewer, Catherine Smith, M.D.  (R. 19-

_____

[7]    The court notes that 20 C.F.R. §§ 404.1527 and 416.927 apply because plaintiff's claims were filed before March 27, 2017.

23.)  Plaintiff avers that while the ALJ found fibromyalgia, degenerative disc disease of the

lumbar and cervical spine, degenerative joint disease of the left hip, and dyshidrotic eczema to be

severe impairments, the RFC assessment does not fully accommodate the functional limitations

resulting from these conditions.  (Pl.'s Br. at 12.)  The court agrees that the ALJ's RFC analysis

is not supported by substantial evidence.

With respect to fibromyalgia specifically, plaintiff argues that the ALJ's RFC

assessment fails to properly account for the functional limitations resulting from this impairment.

See Pl.'s Br. at 16-17, 20-21; Pl.'s Reply 1-6.  Fibromyalgia is "pain and stiffness in the muscles

and joints that either is diffuse or has multiple trigger points."  Dorland's Illustrated Medical

Dictionary, 703 (32nd ed. 2012).  It "is a complex medical condition characterized primarily by

widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at

least [three] months."  Social Security Ruling ("SSR") 12-2p, 2012 WL 3104869, at *2 (S.S.A.

July 25, 2012).

In support of her argument, plaintiff points to evidence in the treatment records

that document plaintiff's claims that she suffers from severe pain.  During the relevant time

period, plaintiff was treated by numerous medical professionals including, inter alia, Vito

Loguidice, M.D., an orthopedic surgeon, see, e.g., R. 662-81; Nicole Chiappetta, D.O., a

rheumatologist, see, e.g., R. 635-60; Nicholas Slenker, M.D., an orthopedist, see, e.g., R. 320-22;

Christopher Ferrante, M.D., an orthopedic surgeon, see, e.g., R. 351-53; Jason Smith, M.D., a

pain management specialist, see, e.g., R. 354-57; James Liott, D.C., a chiropractor, see, e.g., R.

682-96; and physical therapists, see, e.g., R. 433-46.  Plaintiff's treatment included surgery,

medications, injections, physical therapy, and chiropractic care.  The record also contains various

imaging studies, including a December 2016 MRI of the lumbar spine which shows degenerative

disc disease, see R. 527, and a September 2018 MRI of the cervical spine which shows

multilevel disc disease with probable abutment of nerve roots, see R. 720-22.  Plaintiff testified

at length during the administrative hearing regarding her complaints of pain and that due to pain,

she has difficulty, inter alia, sitting, standing, walking, grasping, reaching, and lifting.  (R. 42,

49, 53-63.)

   With respect to fibromyalgia specifically, plaintiff was referred by her surgeon,

Vito Loguidice, M.D., to a rheumatologist in December 2016.  See R. 296.  A treatment record

dated December 15, 2016, reflects that Nicole Chiappetta, D.O., diagnosed plaintiff with

fibromyalgia after observing 15/18 tender points.  Id.  Dr. Chiappetta also noted that plaintiff

reported that her "symptoms have involved her whole body, now with sweats, chills, pins and

needle sensation, and fatigue" and indicated that plaintiff was "tender to touch diffusely."  Id.

Other treatment records of Dr. Chiappetta dated February 2017, March 2017, August 2017,

September 2017, December 2017, and April 2018 continue to document plaintiff's complaints of

diffuse pain, chills, night sweats, and pins and needles sensation in her extremities.  See

generally R. 639-60.  The most recent treatment note contained in the record, dated April 12,

2018, indicates that plaintiff reported experiencing, inter alia, night sweats, weakness or fatigue,

loss of appetite, trouble sleeping and daytime sleepiness, skin rashes, and changes in her skin,

nails, and hair, as well as joint pain and muscle pain.  See R. 635.  Dr. Chiappetta further

documented that plaintiff had problems with light household tasks, difficulty climbing stairs, and

had fallen in the last six months.  (R. 636.)  At the same time, Dr. Chiappetta observed normal

gait, intact range of motion and strength, but 15/18 active trigger points.  (R. 637.)  Dr.

Chiappetta noted that the examination "was positive only for evidence of active fibromyalgia."

(R. 638.)  She increased plaintiff's dosage of Lexapro, prescribed a gel for knee pain, and

directed plaintiff to return in four months.  Id.[8]

       Nevertheless, in explaining the RFC assessment, the ALJ indicated that while

plaintiff suffers from fibromyalgia, plaintiff's complaints of pain were not supported by the

record.  The ALJ stated:

> The claimant's hip and back surgery were largely successful and her ongoing
> complaints as to diffuse pain result primarily from her diagnosed fibromyalgia.
> While she still suffers from discomfort and restricted mobility, she would remain
> capable of sedentary exertional level work with accommodation for a sit/stand
> option.  Restricted exposure to environmental conditions have been included to
> reduce the risk of exacerbations of symptoms.  The undersigned has also added
> allowance for use of an assistive device for balance and ambulation, and limits the
> claimant to unskilled work secondary to chronic pain from her fibromyalgia,
> giving the claimant the benefit of the doubt as to her subjective complaints.  She
> is under the care of a rheumatologist who she sees 2-3 times per year and who
> prescribes her appropriate medications which help relieve her symptoms.  She
> began chiropractic treatment in July 2018, with physical examination generally
> normal, but notable for active myofascial trigger points producing pain and
> tenderness, for which she received short-term treatment to help relieve those
> symptoms.  She is currently engaging in no physical therapy or chiropractic
> treatment and is only seen on a regular basis by her treating rheumatologist, who
> prescribes medication.

(R. 23.)

---

[8]    The April 12, 2018 treatment record provides a summary of the various medications
prescribed by Dr. Chiappetta during plaintiff's course of treatment in an attempt to address
plaintiff's complaints of pain.  It explains that upon initial exam, Dr. Chiappetta:
> prescribed Lyrica, however this was not covered by her insurance, therefore she was
> prescribed gabapentin, which she has since titrated to 300 mg twice daily with 600 mg at
> bedtime.  This did initially help with her symptoms, however she states she has had
> increasing pain over the last few weeks.  I then added Cymbalta, however she has noted
> no relief with this.  We then added Lyrica, which she titrated up to 200 mg BID.
> Unfortunately she has had poor tolerance to this and we therefore tapered off.  At her last
> visit we decided to try low dose naltrexone at 1.5 mg daily.  She has tolerated this well,
> and we since increased the does to 3 mg daily.  However, she has noticed no difference
> with this.

(R. 637.)

This analysis is troublesome for several reasons.  As an initial matter, the ALJ's contention that the medication prescribed by plaintiff's rheumatologist "help[s to] relieve her symptoms" is belied by the record.  Plaintiff testified at the administrative hearing that she was prescribed various medications to address her complaints with little, or temporary relief.  See R. 44-46.  Some of the medications caused her eczema to flare.  (R. 45-46.)  As noted supra, the rheumatology records support this testimony.  See R. 637.  Additionally, the ALJ appears to cast doubt upon plaintiff's claims by noting that plaintiff "currently is engaging in no physical therapy or chiropractic treatment and is only seen on a regular basis by her treating rheumatologist, who prescribes medication."  (R. 23.)  In so doing, the ALJ does not take into account that plaintiff received chiropractic treatment in July 2018 and that she testified at the September 25, 2018 administrative hearing that she "was only allowed eight [chiropractic] visits."  (R. 44, 688-96.)  The court further notes that, contrary to the ALJ's assertion, plaintiff continued to seek treatment for pain from Dr. Loguidice, the orthopedic surgeon, in addition to her rheumatologist.  On June 27, 2018, plaintiff was seen by Dr. Loguidice for complaints of low back pain and cervical pain.  (R. 662-65.)  He indicated that plaintiff presented with neck pain "that radiates to the Thoracic spine with tingling into the arms that radiates to the chest and ribs, this is constant worse in the morning."  (R. 664.)  Dr. Loguidice noted that plaintiff also was treated by rheumatology and had been diagnosed with fibromyalgia.  Id.

In addition, the ALJ suggests that plaintiff's subjective complaints of pain are not credible, but does not offer a proper analysis in support of this conclusion.  The ALJ stated:

> In summary, the undersigned finds that the claimant's impairments have compromised her ability to perform exertional, manipulative, and postural work-related activities to the extent reflected in the above residual functional capacity. However, the claimant's subjective complaints and alleged functional limitations exceed the objective evidence of record, which would indicate a greater level of

functioning, as evidenced by the longitudinal treatment record and the opinions of one examining and one reviewing medical professional.

(R. 23.)

However, caselaw guides that reliance on objective testing to discount a claimant's subjective complaints with respect to fibromyalgia may not be appropriate. "There is no question that fibromyalgia, an elusive problem, poses special circumstances in the social security arena. In evaluating fibromyalgia, courts acknowledge that symptoms of the disease are entirely subjective and medical testing may not be able to assess its severity." Wiant v. Colvin, 2016 WL 3261881, at *3 (W.D. Pa. June 14, 2016). See Wilson v. Apfel, 1999 WL 993723, at *1 n.1 (E.D. Pa. Oct. 29, 1999) (symptoms of fibromyalgia are subjective), aff'd, 225 F.3d 651 (3d Cir. 2000). See also Merritt v. Berryhill, 2018 WL 1162848, at * 10 (E.D. Pa. Mar. 5, 2018) (There are "unique difficulties associated with diagnosing fibromyalgia, as there are no objective tests which conclusively confirm the disease.") (citing Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003)).[9]  Rather, "[d]ue to the subjective nature of the diagnosis, the credibility of a

---

[9]      The difficulty in assessing fibromyalgia has been described as follows:
[The] cause is unknown, there is no cure, and it is poorly-understood within much of the medical community.  The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms.  The American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis."  Benecke v. Barnhart, 379 F.3d 587, 590 (9th Cir. 2004).  In fact, fibromyalgia patients often "manifest normal muscle strength and neurological reactions and have full range of motion."  Rogers v. Commissioner of Social Security, 486 F.3d 234, 244 (6th Cir. 2007) (citing Preston v. Secretary of Health and Human Services, 854 F.2d 815, 820 (6th Cir. 1988)).  In order to diagnose fibromyalgia, a series of focal points must be tested for tenderness and other conditions must be ruled out through objective medical and clinical trials.  Id. at 244.  Symptoms associated with fibromyalgia include "pain all over," fatigue, disturbed sleep, stiffness, and tenderness occurring at eleven of eighteen focal points.  Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996).
Lintz v. Astrue, 2009 WL 1310646, at *7 (W.D. Pa. May 11, 2009).  In addition, courts have held that "conservative treatment is appropriate for fibromyalgia.  Indeed, massage, exercise, anti-inflammatories, trigger-point injections and other approaches may be appropriate treatments

claimant's testimony regarding her symptoms is especially significant in the evaluation of the evidence." Gregory v. Berryhill, 2019 WL 643736, at * 8 (Feb. 15, 2019) (citing Singleton v. Astrue, 542 F. Supp. 2d 367, 378 (D. Del. 2008)).

Here the ALJ discounted plaintiff's "subjective complaints and alleged functional limitations" on the basis that they "exceed the objective evidence of record." (R. 23.) However, "unverified subjective complaints consistent with the fibromyalgia cannot be discredited for lack of objective evidence." Newman v. Saul, 2020 WL 881021, at *4-5 (M.D. Pa. Feb. 21, 2020) (internal citations and quotations omitted). See Foley v. Barnhart, 432 F.Supp.2d 465, 476, 480 (M.D. Pa. 2005) ("[I]n a disability determination involving fibromyalgia, it is error to require objective findings when the disease itself eludes such measurement."). Moreover, in reaching this conclusion, the ALJ pointed to the "longitudinal treatment record" and the opinions of Drs. Monfared and Smith as evidence that countered plaintiff's complaints of pain. As an initial matter, it is unclear to which treatment records the ALJ refers when pointing to the "longitudinal treatment record." In any event, treatment records from 2018 support plaintiff's claims of pain. As noted supra, in April 2018, rheumatologist Dr. Chiappetta documented that plaintiff reported experiencing, inter alia, night sweats, weakness or fatigue, loss of appetite, trouble sleeping and daytime sleepiness, skin rashes, and changes in her skin, nails, and hair, as well as joint pain and muscle pain. See R. 635. Dr. Chiappetta further noted plaintiff's problems with light household tasks, difficulty climbing stairs, and that she had fallen in the last six months. (R. 636.) While Dr. Chiappetta observed normal gait, intact range of motion and strength, she also noted 15/18 active trigger points. (R. 637.) In addition, the June 2018 treatment note of Dr. Loguidice documented plaintiff's complaints of night sweats, weakness or fatigue, loss of appetite, trouble

for fibromyalgia and that surgery may not be appropriate or required." Payne v. Berryhill, 2019 WL 1082488, at *2 (W.D. Pa. Mar. 7, 2019) (internal citations and quotations omitted).

sleeping and daytime sleepiness, joint pain, muscle pain, and rashes.  (R. 662.)  In addition, Dr.

Loguidice observed "spine tenderness on palpation" and range of motion limited by "painful

flexion" and "painful extension."  (R. 664.)  Dr. Loguidice diagnosed neck pain, cervical

radiculopathy, and thoracic back pain, and referred plaintiff for chiropractic treatment with Dr.

Liott.  Id.  Dr. Liott's July 16, 2018 treatment note indicates decreased range of motion,

decreased sensation in the upper right extremity, and active myofascial trigger points.  See R.

694.

　　　　　　Moreover, the opinions of Drs. Monfared and Smith relied upon by the ALJ to

discount plaintiff's claims do not shed light on the functional limitations resulting from

plaintiff's fibromyalgia.  Neither opinion discussed the impact of fibromyalgia.  In fact, Dr.

Monfared's January 5, 2017 examination record and functional assessment do not mention

fibromyalgia.  See R. 532-45.  Dr. Smith made only a passing reference to fibromyalgia.  See R.

81, 91.[10]  Thus, contrary to the ALJ's assertion, the longitudinal treatment record and the opinion

evidence do not offer the support that the ALJ suggests.[11]

---

[10]　　　Dr. Smith provided the Disability Determination Evaluation in connection with the denial
of plaintiff's claims at the initial level.  (R. 74-93.)  In support of the RFC assessment contained
therein, Dr. Smith offered the additional explanation:
　　　　　10/14/16 L SI fusion
　　　　　10/24/16 repositioning one screw
　　　　　12/16/16 using cane s/p surge. L EHL 3/5, some of which is chronic. MRI sm 1 bulge.
　　　　　Rheum suspects fibro as cause of longstanding total body pain, as seriologies are neg
　　　　　1/5/17 surg L hip and SIs. Lives w/ son, cooks, chores, socializes. limp fav R, crutch
　　　　　makes it more stable
(R. 81, 91.)

[11]　　　The opinions of Drs. Monfared and Smith were rendered in January 2017 and plaintiff
was diagnosed with fibromyalgia in December 2016.  The ALJ was entitled to consider this
evidence, but its probative value was weakened by subsequent developments in the record, as
acknowledged by the ALJ.

Generally, an ALJ may disregard subjective complaints when contrary evidence exists in the record.  Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir. 1993).  The ALJ must, however, provide her reasons for doing so.  Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000); Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990) (noting that ALJ may reject claim of disabling pain where he has considered subjective complaints and specified reasons for rejecting claim).  "Even in fibromyalgia cases, the ALJ must compare the objective evidence and the subjective complaints and is permitted to reject plaintiff's subjective testimony so long as [s]he provides a sufficient explanation for doing so."  Nocks v. Astrue, 626 F. Supp. 2d 431, 446 (D. Del. 2009) (citing Prokopick v. Comm'r of Soc. Sec., 272 F. App'x 196, 199 (3d Cir. 2008) (not precedential)).  The ALJ's decision was not congruent with these standards. Neither the longitudinal treatment records nor the opinion evidence appears to provide a basis for discounting plaintiff's subjective complaints.  Moreover, the ALJ provided no meaningful explanation for this statement.  This analysis did not satisfy the ALJ's obligation to explain why she determined that plaintiff's impairments were not as limiting as plaintiff claimed at the administrative hearing.  While the ALJ was not required to wholly accept each of plaintiff's claimed limitations, the ALJ was required to evaluate plaintiff's subjective complaints in accordance with the proper standards.  Here, substantial evidence does not support the ALJ's RFC assessment.  See Payne, 2019 WL 1082488, at *2 (remanding case for further consideration because ALJ improperly discounted severity of fibromyalgia on the basis that plaintiff received conservative treatment and ALJ failed to provide a meaningful analysis of the plaintiff's subjective complaints of pain).

This court is cognizant of the fact that there is "no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record," Hur v. Barnhart, 94 F.

App'x 130, 133 (3d Cir. 2004) (not precedential), and that "[a]n ALJ may accept some of a medical source's opinions while rejecting other opinions from the same source." Comiskey v. Astrue, 2010 WL 308979, at *9 (E.D. Pa. Jan. 27, 2010) (citing Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202-04 (3d Cir. 2008)).  However, an ALJ may not "'pick and choose' among the evidence, selecting only that which supports [her] ultimate conclusions." Middlemas v. Astrue, 2009 WL 578406, at *9 (W.D. Pa. Mar. 5, 2009) (citing Morales, 225 F.3d at 318 (an ALJ may not simply rely on "the pieces of the examination reports that supported [his] determination," while excluding other evidence)).[12]

       While the ALJ offered a detailed summary of the medical evidence, the ALJ did not provide a proper analysis of the effects of plaintiff's fibromyalgia on her RFC.  That is, it is unclear whether the ALJ took fibromyalgia into consideration, individually or in combination with plaintiff's other impairments, in assessing plaintiff's RFC.  The record demonstrates that plaintiff continued to seek treatment for hip, back, and neck pain after her 2016 surgeries, as evidenced by the treatment notes with orthopedic surgeon Dr. Logudice and chiropractor Dr. Liott, the lumbar spine MRI which shows disc herniations, and the cervical spine MRI which shows nerve root abutment.  See, e.g., R. 527, 720-22.  It is well beyond this court's authority to determine how fibromyalgia impacted these orthopedic issues and plaintiff's other impairments.

       Indeed, the court is mindful that this court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence."  42 U.S.C. § 405(g); Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir. 1994).  This court may not undertake a de

---

[12]    Additionally, case law guides that an ALJ "may not reject pertinent or probative evidence without explanation." Johnson, 529 F.3d at 204.  The ALJ must provide not only an expression of the evidence she considered which supports the result, but also some indication of the evidence which was rejected. Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981).  "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Id.

novo review of the Commissioner's decision or re-weigh the evidence of record.  Monsour Med.

Ctr., 806 F.2d at 1190-91.  See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir.

2012) ("Courts are not permitted to re-weigh the evidence or impose their own factual

determinations."); Burns, 312 F.3d at 118 ("We also have made clear that we are not permitted to

weigh the evidence or substitute our own conclusions for that of the fact-finder.").  See also

Cortes v. Comm'r of Soc. Sec., 255 F. App'x 646, 653 (3d Cir. 2007) (not precedential) ("The

grounds upon which an administrative order must be judged are those upon which the record

discloses that its action was based.") (quoting S.E.C. v. Chenery Corp., 318 U.S. 80, 87 (1943));

Clinkscales o/b/o T.S. v. Colvin, 232 F. Supp. 3d 725, 735-36 (E.D. Pa. 2017) (same).

       In light of the foregoing, the case will be remanded for further proceedings.  Upon

remand, the ALJ should consider the evidence pertaining to fibromyalgia, and resulting

functional limitations, if any, that are supported by the administrative record throughout the

sequential evaluation process.  The Commissioner may well reach the same conclusion;

however, in the absence of sufficient indication that the Commissioner considered all of the

evidence in the case and applied the correct legal standards, this court cannot satisfy its

obligation to determine whether substantial evidence supports the Commissioner's decision.  See

Terwilliger v. Chater, 945 F. Supp. 836, 844 (E.D. Pa. 1996) (remanding case in the absence of

sufficient indication that the Commissioner considered all of the evidence).

       **B.**    **Other Claims**

       Plaintiff raises several issues pertaining to the impact of her eczema on her ability

to work.  See, e.g., Pl.'s Br. at 12-15 (plaintiff is not capable of sedentary work if her hands are

not available for tasks), 18-19 (eczema prevents plaintiff from using her hands on a frequent

basis as required by the jobs identified by the ALJ), 21-23 (plaintiff's eczema meets the severity

of Listing 8.05).  Plaintiff also questions the ALJ's finding that plaintiff is capable of performing sedentary work with a sit/stand option, which work requires the bilateral use of her hands, given the ALJ's further finding that plaintiff requires the use of a cane for standing.  See Pl.'s Br. at 15-16.  Additionally, plaintiff alleges error with respect to the ALJ's reliance on the VE's testimony, the ALJ's assertion that there were no opinions from treating sources, and the ALJ's step five finding.  See Pl.'s Br. at 17, 24-28.

As discussed supra, the ALJ failed to properly address the evidence of fibromyalgia in the RFC assessment.  Such failure impacted, or may impact, the ALJ's consideration of the evidence pertaining to plaintiff's other impairments.  Given the court's recommendation that the case be remanded, the court will not address the other issues raised by plaintiff.  A remand may produce different results on plaintiff's application, making discussion of these claims moot.  See Steininger v. Barnhart, 2005 WL 2077375, at *4 (E.D. Pa. Aug. 24, 2005) (concluding that the ALJ's hypothetical was deficient and the vocational expert's answer to it does not constitute substantial evidence for the ALJ's decision and declining to address plaintiff's other arguments for remand, "as the ALJ's findings may be revised in any decision issued following the new hearing").  See also LaSalle v. Comm'r of Soc. Sec., 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011) (remanding for the ALJ's failure to consider and analyze all relevant medical evidence regarding plaintiff's mental impairments and declining to examine plaintiff's additional claims because a "remand may produce different results on these claims, making discussion of them moot"); Nieves v. Astrue, 2010 WL 629831, at *7 (E.D. Pa. Feb. 19, 2010) (same); Watson v. Astrue, 2009 WL 678717, at *6 (E.D. Pa. Mar. 13, 2009) (declining to address plaintiff's remaining claims "until the basis for the ALJ's ruling is clarified through remand").  To the extent that the ALJ's reconsideration of plaintiff's fibromyalgia is

intertwined with or affects the analysis of plaintiff's other impairments, the ALJ should explain and consider same upon remand.  If the ALJ again determines that plaintiff retains the RFC to perform a limited range of sedentary work, she must provide an adequate basis for her determination.

V.     **CONCLUSION**

After a careful and thorough review of all of the evidence in the record, and for the reasons set forth above, this court finds that the ALJ's findings are not supported by substantial evidence.  Accordingly, plaintiff's Request for Review will be granted to the extent that the matter is remanded for further proceedings consistent with this opinion.

An appropriate Order accompanies this opinion.

BY THE COURT:

____/s/ Thomas J. Rueter_____
THOMAS J. RUETER
United States Magistrate Judge